Service, and Mr. Autry is here for the appellant, Ms. Rubin for the appellee, and Mr. Autry, you may begin when you're ready. May it please the Court. The universal R minus C equals P. Revenue minus cost equals profit answers all three of the issues the Court faces in this economic substance case. One. Not according to Dr. Colby. Yes, and that's the second issue. And that is that one cannot redefine R minus C equals P by excluding revenue. One can never calculate profit by excluding revenue. We know, and this is our first point, that the R minus C equals P provides over $60 million of expected net profit, according to the IRS expert, that answers the economic substance under the three controlling Supreme Court cases in 2000. Well, let me ask you this. Yes, sir. The district judge weighed the testimony of the experts, Dr. Colby against Curtis Investments experts, Walker and Ciccatello, and found Dr. Colby's testimony to be more persuasive that this transaction lacked any economic substance. It was only for the purpose of tax avoidance. And we sort of, I mean, we defer to the tax court on these determinations. Point me to a finding of fact that the tax court relied upon that's clearly erroneous in order to make that determination. There are a number of findings of fact, but the challenge is what's not in the record. The court never put the government to its burden of proof of demonstrating that Dr. Colby met any of the Daubert standards. So you can't point to a finding of fact that you can say is clearly erroneous? The court basically finds favorably that there's a 9.3% profit margin, makes no finding that says that one excludes revenue. In its argument, it starts out by saying one excludes revenue. That's an error as a matter of law. And then it goes on and embraces Dr. Colby and never mentions the fact that his sole authority criticizes this idea of excluding revenue. Dr. Colby says this financing arrangement had no reasonable possibility of profit. Is that an erroneous finding of fact? Dr. Colby, yes. If you rely on Dr. Colby's opinion? Well, we say it's an error as a matter of law because Dr. Colby says that after excluding revenue and his reasonable prospect of profit, and we say as a matter of law, you cannot calculate profit without considering revenue. And Dr. Colby goes in and says, I'm doing this based upon Brealey and Myers. And when we look at Brealey and Myers, Brealey and Myers says you cannot exclude revenue. You cannot exclude, can't segregate the investment side. To do that, the phrase that treatise used would be a financial camel. So if one applies the Daubert standards to test if it's subject to peer review or known error rate or accepted or tested, we know his method violates every one of those elements. His sole treatise says that we demonstrated at trial that there's a 100 percent error rate in his good loan, bad loan analysis, which actually draws to the conclusion that a prime interest rate loan in 2000 would be a bad loan under his analysis and would therefore lack any reasonable prospect of profit and therefore would be a sham. So our attack with respect to the methodology is that it was never tested as this Court requires under Frazier that a party offering an expert must make the showing as to the elements. Never required here. And the reason it was never required here because we had just finished proving that his methodology had been rejected by his own authority and that it was a 100 percent error rate. So if one corrects for that one point of law and one aligns himself with the second point of law, and that is that the Supreme Court requires that we consider the whole undertaking, the nature of the entire activity, that one cannot slice and dice. Judge Browning, it's very much like a decision that you had in American Electric in February of 2001, which said you can't slice these things up, you can't break them up into parts. That dealt with corporate-owned life insurance many years ago. But if we recognize that we have to consider the whole undertaking, a proposition that the government concedes at page 35 of its brief, as a matter of law, the prevailing Supreme Court authority requires that we consider the whole undertaking, then we're back to the reliable R equals C minus P and we're not stuck with somehow profit equals cost under Dr. Colby's criticized theory under his own treatise. Try to explain to me in a couple of minutes why this transaction had economic substance. Because these people came in, there's a missing element in the opinion, an important missing element. It's presented to them as a zero-coupon, interest-free use of proceeds for 30 years. And so you look at that, does it make sense to enter into that or not make sense to enter into that in exchange for becoming jointly and severally liable? There's a stipulation 51 that says we're becoming directly recourse liable, CIC is, for this entire 35 million euro debt. Does that make sense or not make sense? But they weren't getting the 35 million dollar euro. They were getting 5 million, 5 point something million. Well, they're getting the benefit of the 35 because 30 of the 35 is covering the interest. It's that 30 that's covering the interest that ensures they have interest-free use. What is the value of the interest-free use? Jay Byrd did not accept that at its face value. He went through a detailed analysis, an Excel spreadsheet and Exhibit 4J and says, does it make sense or does it not make sense? It makes sense. As the court found... You're supposed to... I'm trying to figure out how this transaction works and I'm still having trouble figuring it out after reading the tax court's order, reading the two briefs. I think I have it, but I'm not sure that I do. They, a separate... Tell me where I get this wrong and I'm going to ask your counterpart the same thing. There is a separate entity that is created, a third entity, right? It's that entity that gets the $30 million plus loan. Your clients agree to be liable for repayment of that $30 million. Correct. And they get five point something million. Interest-free. Right. Okay. That's absolutely correct. That's the transaction. That's it. And you use it. Everything they're told at the time, you use this 30 years... And how much is the interest on the $30 million over the period of the life of the loan? It's about... Well, we calculated the hurdle rate, which was complete... Under your theory, what's the interest? The hurdle rate is 7.9, including the payment of the principal. The interest rate is about... No, no. I'm looking for numbers. The interest rate that's being paid with the benefit of the deposit accounts, it's about a little shy of 8%. It's about 8%. I'm not asking for percentages. How much is due on the loan for $30 million? Well, the rate starts out at 5.5% plus 50 basis points. Under your... You don't have to explain it to me. Yes. Under your theory, what your witnesses testified to, how much interest is due on that $30 million by the end of the loan period? I do not know the number. It's on the 4J schedule, and it's a large number. And then there's another $60 million of profit beyond payment of all interest, payment of all principal, and payment of all fees. So the net profit... Net profit to whom? Net profit to our people, to Curtis Investment Company. They only got $5 million. They got $5 million. It's a remarkable thing. Interest-free... It is. It does sound like a remarkable thing. Well, and again, you cannot take it at face value. And they did not take it at face value. They went back through and they calculated, look, what is our back-tested rate of returns on our money? It's 17.2%. No dispute about that. Okay. It's 17.2%. Hold on. Hold on. Yes, sir. You're up here in theory, because you know this case inside out. I'm down here in the weeds and trying to work my way out of a college tax course. If your clients... See if you can explain this to me. Your clients are getting a hard $5 plus million in cash... Yes, sir. ...out of this transaction, right? To use. Right. To use as they wish. All right. That's so far I'm correct. Yes, sir. In exchange for that, they are guaranteeing repayment of principal and interest on a $30 million loan to a third entity. Yes. Okay. When is that $30 million due and payable? It's on a balloon basis at the end of the 30 years. Okay. How much is the interest? When are the interest payments due on that 30-year loan? CIC pays no interest. It gets paid annually by the deposit account. When is the interest due on the loan? Every year. It's getting paid every year. No, no. Not your client. No, no. The entity that loaned the money. Yes. They're getting... What's the percentage rate on the loan? They're getting... To start with, it's reset annually, but it's 5.5% plus 50 basis points. And so they get that the first year and it's an adjustable rate debt structure. So it's adjusted at end of the year. Whatever interest rates are doing, it's going to be that plus 50 basis points. And the borrower is getting paid that interest every year. It's getting paid that interest from the interest-bearing deposit accounts. And so because those interest-bearing deposit accounts are servicing the debt or the interest due on the debt, we get the $5 million interest-free. Interest-free for 30 years. And that is what exponentially grows to render the $60 million profit. But the tax court says that the investments that were made with the proceeds from the loan are collateral to the transaction. That they didn't contribute to your client's ability to claim a tax benefit based on the opinion of Dr. Colby. And why can't the court accept Dr. Colby's testimony to that effect? If it wants to, the tax court. Dr. Colby, I submit to you, never gets beyond Daubert. None of that makes sense. If he doesn't get beyond Daubert, he... What if he gets beyond Daubert? He's an expert. He's qualified. And we, and I know you dispute that, but his opinion rests on reliable methodology and it's helpful to the finder of fact that we get beyond that. Why can't the tax court say, I credit Dr. Colby over your client's experts that the investments made with the proceeds from this loan did not contribute to your client's ability to claim a tax benefit? If one accepts Dr. Colby's theory, contrary to his theory, that profit equals cost, we're dead. We're absolutely dead. We think that theory is demonstrably false for the reasons we've briefed and for the reasons that we think he cannot possibly, under Frazier, meet the strictures of Daubert in 702, and that's why the court erred as a matter of law and making no showing as to Daubert. But it's absolutely true, Judge Wilson. If one accepts Colby, that theory is completely inconsistent with the Supreme Court's theory in Gregory v. Halvering, Frank Lyon, and the Clark case, which is very similar to the, you have to look at as a whole in American Electric. If one rejects the Supreme Court theory that you look at as a whole and accepts Dr. Colby's theory that you ignore the revenue in calculating profit, we're dead. We're absolutely dead. He also says that your client could have made the same investments with a much less expensive conventional loan, suffering far less financial detriment. Why isn't that? That's false. It's false on its face in this sense. It says this idea of there are alternative loans available. You could go pay interest. Nobody's offering us an interest-free loan except this proposition. In 2001, we tried to get a replacement. We're looking at the same level of fees. Nobody, and we shopped the trying to get the letter of credit around to a number of banks. Nobody is giving us that same interest-free deal. All right. Now, if I understand this, the only way this transaction makes any sense economically is if you get over 17 percent return on the 5 million euros. Yes. So you're saying you're willing to borrow 5 million dollars and pay back 30 million plus interest at the end. The only way you can even break even is to earn over 17 percent in the interim, and you get there because somehow you're able to show that, well, that's how much money we've been able to make on money we borrow. Now, what were the interest rates at the time this transaction was made? How much would they have had to pay for the 5 million if they just borrowed 5 million instead of 30? We have a stipulation as to the prime interest rate at 9.5 percent at the time. And so that situation— So how long would it take you to pay off the 5 million at 9 percent? It would be a lot less than 30 years, wouldn't it? But it's eating into— If you're making 17 point some percent. If you ran those numbers, you wouldn't have the 60 million dollar profit because of the interest rate. It's the geometric growth of interest-free money. And they tested. They had that question. Do we want to incur this level of debt? That's why they made sure that they went back and got their actual 25-year back testing at 17.2 percent. That's a risky bet. Their actual performance had been higher. It was at 20 percent. And so that's the decision. That's a business judgment that they exercised. If you could have borrowed 5 million at 9 percent, how long would it take you to pay it back if you're earning 17 point something percent? It would take you a number of years, but you would never get— Not 30 years, would it? Would not take 30 years. It would not get to 60 million dollars of net profit either. All right. Well, you've gone way over your time, Mr. Autry. Let's hear from Ms. Rubin. May it please the Court. My name is Jennifer Rubin, and I represent the Commissioner of Internal Revenue in this case. And why don't I start with what Judge Jordan asked. You wanted to go through the transaction. And I think most of what you said is absolutely on the money. There was a separate entity created specifically for the purpose of taking out a loan. That entity held 85 percent of the proceeds, and that 85 percent is where the money would initially come from, either to pay interest or anything else, or if the loan was pulled. So, yes, when Curtis Investment Company, like all the other people who took cards transactions out, you know, took on joint and several liability, they also had an agreement that the money would come first from Braundisbury, the special entity created with British foreign entities. The second thing I'm going to say is, yes, they say they got five million dollars in investable funds, but they paid 2.3 million dollars in upfront fees. And they would have— But why is that so important if the goal is over, under their theory, overall profit at the end of the loan period? For example, and I'm not accepting their position, but if they're right, if they're going to make 50 plus million, two million seems like chump change. Doesn't matter. You're trying to make it seem as though, oh, my God, they only got five, but they would have had to pay 2.5 for all of their experts and consultants and reviews. That's not economically feasible, but that takes a very short-term view of the investment over a long period of time. Because the same investment could have been made with any money from any source. Then the size of that doesn't matter. Then the size of that payment doesn't matter if you're right. It certainly does because that's where the analysis comes from to say that this loan was extraordinarily expensive. You know, even their own experts said that they only got 2.25 million dollars in investable funds. And if you look at the Colby report, and I'm looking specifically at Exhibit 191-R at 61 to 62, he shows that a loan with similar terms, so the same interest rate that HVB put on it and the same origination fee that HVB put on it without all these extra fees that were put on for this amount of money that Dr. Colby said they got, which was something like 3.3 million dollars, which is even more than their experts said, it would have been substantially cheaper than this. With the tax benefit included? There had been no tax benefit, but in terms of deciding whether there was an economic effect, you have to ignore the tax benefit. Taxpayers are allowed to use the tax system to their advantage as long as they play within the rules. And every once in a while, a company will take a transaction that is economically less advantageous because it produces significant tax benefits, right? Why isn't that sort of what's happening here? There has to be an economic effect other than the tax benefit. Sure, you may decide to take a 3 percent gain instead of a 5 percent gain because under the 3 percent gain under current tax rules, you're going to get taxed less. Is that legitimate? Not when your gain is completely from a separate transaction. Remember, the loss here was entirely based on the cards transaction. If there was no investment, they take the same loss in 2000. By the same token, they can make the same investments using any money, and in fact, they did. Well, hold on. That's what I don't understand. Where is the tax deduction coming from in this three-corner transaction? The tax deduction is coming from this. They say, oh, well, we got this note that had a face value of $5 million, but I took on $32 million worth of debt. So that's $27 million of loss. Even though they weren't on the hook for $27 million in 2000, and they knew it. The other thing to keep in mind— What do you mean they weren't on the hook? You mean legally or practically? Practically. If the loan got pulled, the money would first come from the money held by Brondisberry, which is what happened in 2001. Now, remember, the tax court held here, based on a number of facts, that this loan, even though it had a 30-year term on it, was never intended to go for 30 years. Many things had a one-year term, including, most intriguingly, a forward contract that Curtis was required to take on. And what that forward contract required them to do was, on February 14, 2001, to send liquid United States dollars—let me make sure I've got my numbers correct here—$5,369,208.60 in liquid U.S. dollars, meaning dollars that aren't sitting in some long-term investment, right? Send it to HVB to be turned into euros. That were almost the exact amount of money necessary to close out Curtis Investment Companies and the Lonnie Baxter's cards transactions. It was only off by 9,500 euros. And so what they found was, look, here you're basically paying for a loss that you know you're never going to take. You know you're never going to eat. And the fact is, to be sure, when you have a truly integrated transaction, of course, we'll look at multiple transactions together to determine if there's an economic effect. But for two different reasons, it's very reasonable to say, no, no, no, these investments were completely separate. The loss had nothing to do with the investments. They hadn't even done the investments in 2000 when they claimed the loss. When the loan got pulled, what was the net economic effect to Curtis Investments? The amount that they were given when they redeemed the promissory note, plus a small additional amount that was equal to the interest that Brondisberry had paid. And what happened to the $30 million face value of the loan? Brondisberry paid most of it because most of it was in an account that could only be related to this loan. And where did the rest of it come from if all of it didn't come from Brondisberry? Certainly. Basically, Curtis Investment Company returned the money that it received. The five plus million dollars. Right. That's right. So, you know, you have a couple different things going on here. The first thing is that, and we listed a number of cases going all the way back to James and look, you don't look at other transactions that aren't truly part of the loss generating transaction to determine economic effects, to determine the economic substance. And here, we know you could make these same investments with other money. They did. They used money from the ABP sales to make these same investments. They got a margin loan in 2001 to pay back the amount of money that they were going to pay to the, that they were going to need to pay back to HVB. Who operated Brondisberry? Brondisberry was created by two British residents. In the cards transaction, you always have pretty much a foreign resident who's not subject to U.S. taxation so that they don't have to do a corresponding gain on a United States tax return. Did anybody besides those two gentlemen or women have any control over what Brondisberry did with the loan proceeds? Well, the contracts required them to keep it in the time, one-year time deposit at HVB and that the money- And after that? Well, again, the court found that it wasn't intended to go any longer than that. I know, but that's not my question. What did the contract say about that? As far as I understand the contracts, Brondisberry was required to keep money on deposit with HVB. And basically, they're part of the proceeds from the HVB loan. And from those proceeds from the HVB loan, that's where the first source of any payments related to the HVB loan, either interest or paying the loan back. See, this is, again, and my understanding of this is primitive at best, but I'm trying as hard as I can to grasp this transaction and what it means financially for everybody. And it seems to me that if Brondisberry had not been required to do anything with the $30 million, then there might be an argument that there is economic substance to the transaction because if Brondisberry decided to invest that in trips to the moon and that turned out to be a fool's paradise and they lost the $30 million, then Curtis would really be on the hook for $30 million no matter when the loan was called. But if there were strings attached to where the $30 million went, then the transaction begins to lose economic substance because there really isn't a risk to Curtis that it's going to be required to pay a portion of the $30 million. Do I have that anywhere close to right? I do tend to think that's right. I mean, we'd probably, I don't want to concede that in situation one that there would be economic substance, but I do believe that the fact that there were strings on Brondisberry, they were required to keep the money on deposit and they were required to have the money from those deposits be used first before any money had to come from Curtis does mean that there was not economic substance. And that anybody who looked at this would know that, especially people who have experience with loans. You know, my opposing counsel keeps talking about prime rate, prime rate, prime rate. These were sophisticated people. They weren't getting loans on prime rate. They were getting loans even before this based on the LIBOR rate, which was a lower rate. And in fact, the margin loan that they got from CIBC in 2001 was, again, it was based on LIBOR, wasn't based on prime rate. And ultimately, what Dr. Colby is doing here, and let's just be clear, just like in the Kerman case, and this is 713 F3 to 866, you know, what you have is a court who allowed extended voir dire, allowed argument at trial as to whether the Colby report should be admitted. So he's clearly qualified, and he is. If you look at Exhibit 191-R, Exhibit A, his education, his experience, his writings all extraordinarily substantial. I thought he didn't have any experience in these types of transactions. I don't think you have to have a specialty in loans in order to be able to apply financial economics to it. And I don't certainly think it's within the tax court's discretion to say he didn't need it. What he said is, look, I'm looking at the terms that HVB actually applied to this loan, and let's apply those same terms. The stronger argument is not that he was not qualified to give an opinion, but that his opinion was not based on reliable methodology because the treatise that he relies upon, what is it, the principles of corporate finance, rejects his theory as a, quote, financial camel. But I don't think that's an accurate description of the whole textbook. As Dr. Colby explained in his testimony earlier, it goes through, you need to make sound financing decisions, and you need to make sound investing decisions. To be sure, you need to put them together in the end. If the best financing that you could get has a higher rate than your best possible return, then you're not going to do the deal. But everyone agrees. You have fact witnesses. You have experts. Everyone agrees. If you fund the same transactions with a higher cost financing, you're going to make less money. It's going to result in negative profit. And that's what he was estimating. That's what he was calculating, was what is the, is there positive return here by using this as opposed to a conventional loan? Or is there negative return? And he found, and the tax court credited this using its, making factual findings that are subject to clear error, that in fact, you would lose 2.19 million euros by going with this loan as opposed to a conventional loan, one that was fully collateralized like this one. And you can even see that again with the CIBC margin loan. You know, its interest rate was a little bit more than this one, but you didn't have the high costs that were attached. And you didn't have this risk of it being pulled after a year. You didn't have the forward contract that was going to require you to take money out of your long-term investments that you claim you want this money for and send it to the bank coincidentally with the same amount of money, basically, that you need to repay your loan. Let me ask you to flip to a second issue, which is where I have a little bit more of a concern about your case. The tax court applied a pretty significant penalty. Yes. But I don't think it really addressed whether or not, although it mentioned it, but it didn't really address whether or not it was reasonable in 2000 before the IRS had really litigated any of these cases, whether or not this transaction was a tax avoidance scheme or was perfectly legitimate. Isn't the tax court applying an after-the-fact rationale to say, oh, you know, in the last decade, these schemes have been found to be illegitimate. They've been disallowed, et cetera, et cetera. Penalty on you, even though when you took the deduction back in 2000, there weren't any of these decisions out there. A couple of things. First of all, it can't be the case that if you come up with some new tax shelter that you get a get-out-of-jail-free card on the penalties. No, but this case took, this was not a case that went out on summary judgment with the tax court saying, this is so patently clear that I'm rejecting it. This was a three-day trial with witnesses for both sides, heated debates about the economics of the financing, whether or not the experts' opinions were valid, whether or not there was economic substance to a transaction. We're having trouble, or at least I shouldn't say we. I speak only for myself. I'm having trouble figuring out the basics of this transaction, and the tax court lays what, a 40 percent penalty? Is that about right? Yes. In 2015, for a 2000 transaction that took three days of trial to figure out, there's something about that that seems odd to me. Let me say a few things. After the trial, the court said, I have some concerns about the penalties. I'm going to look at everything. I may be leaning towards the taxpayers. And then she looked at everything and made factual findings and said, I find that there's no reasonable cause for what happened here. And the first thing she said is, look, the economic substance doctrine has been out there for a long time, and I believe the taxpayers knew they weren't really, that this was a loss. They knew they were over-claiming the basis. And I know that, and she made findings regarding that. The second thing she said is, you know, I don't believe that they really made good faith reliance on independent advisors. And first, she made an analysis regarding Brown and Wood and said, you know, on its face, you know that this is not an independent piece of legal advice. Did the advisors have a conflict of interest? Certainly, R.J. Rubel from Brown and Wood did. There was an inherent conflict of interest. He was, you know, tied to the promoter in very strong ways. He was being paid through the promoter. He was, you know, the promoter was sending his opinion saying, use him to get your opinion at the same time that he was acting as... A finding of fact on that. There is a finding of fact on that. Moreover, as far as the local advisors, you know, you look at what they actually said that they did, and they said, well, we looked at the opinion and we read some of the stuff and then we just said it was a good opinion. And that's what the tax court found was that wasn't good enough, especially with taxpayers like this one that have an understanding. They have experience investing. They have understanding of loans. They have really very sophisticated experience with loans. You know, you look at Lonnie Baxter. She was one of the decision makers here. On a transcript 797, she explains, well, we only paid this much in 2001. Well, that's all we owed at that time. And yet, she says, you say you got five million dollars. That was all that you had at issue here. But you're claiming a $27 million loss. I think you knew that was not valid. This is too good to be true. And at that point, you really need an independent analysis. It's not just, well, we like this Brown and Wood opinion. It really needs to be, we have gone through and let us walk you through our own analysis that we've done. It can't be I looked at a few of the cases. I mean, I think what their one advisor, Levin, said is, all the sites I checked were appropriately cited. That's not enough. And that's what the tax court found. And these are factual findings that are subject to clear error. And there's no clear error here. I think we have your argument. Thank you, Ms. Rubin. We'll hear again from Mr. Autry. Thank you, Your Honor. I would like to focus on the reasonable cause aspect that I didn't get to in my original and directed to the remarks that were just made. You recall that on the reasonable cause, there are two questions. Is there a novel or unresolved question? In 2000, there was no novel or unresolved question because the Supreme Court authority specifically said you consider the whole undertaking. Then it still says you consider the whole undertaking. That's exactly what the three trusted advisors followed. And when considering the whole undertaking, one considers R minus C equals P. And they carefully traced through that analysis that led to the conclusion that actually the profit margin was greater than Jay Byrd had looked to. The tax court erred on this particular point because it never tested those three long-time trusted advisors under the three prongs. They're competent. They're highly qualified. They were provided all information available to the taxpayer and the taxpayer genuinely relied upon them. Never tested here. Had that been tested, it would have been clear that the two CPAs and the business tax lawyer who's a University of Virginia graduate, University of Georgia, Emory, LLM. But a $27 million loss and the court found that these people were pretty sophisticated. They had knowledge with respect to loans. That's just too good to be true. Why is that clearly erroneous given the amount of deference that we give to the tax court? For two reasons. We saved the $27 million. As of December 31, 2000, we have a stipulation 51 that says they have complete personal direct recourse debt. And so it is real. There were things that happened later that disrupted that. But as of the end of the year, there's no question that the tax law works exactly as they applied it. We did a motion for partial summary judgment, which the parties conceded for purposes of summary judgment, there was economic substance. The tax law works exactly as it was explained by these advisors to these people. Now, the court ultimately rejected these people on the theory that they didn't exercise independent judgment. That invokes Judge Wilson. Your earlier question, is there clearly erroneous finding? This is clearly erroneous finding that answers that question. You'll recall that the court said that the advisors, the two advisors from the accounting firm, said that the tax would be deferred and not avoided altogether. It would be spread over a period of time. And she said, I reject that because I find nothing, no documentary, contemporaneous evidence of that in the record. She overlooked Exhibit 66P that specifically confirms that they did that independent analysis that is beyond the analysis that was done by the New York law firm, a very thorough opinion by the New York law firm, but it didn't address this point. And these people, through their independent analysis, identified this particular point of law that said that the tax benefits, because it would reduce their basis in their overall assets, would be temporary. They would be recovered as the gains would be increased as they sold off stocks in the future. So the independent analysis is there by her standard. Her standard departs from the C&T standard, a precedential opinion by the tax court, which says these people need only be highly qualified, be provided all information, and be genuinely relied upon. The other area of concern, no dealing is a reference to sophistication. They never did anything without an advisor. No reference to the academic learning disabilities of Mr. Bird, his mother having graduated from high school by correspondence, or the father-in-law who is a Vietnam veteran and lost his sight and suffered some post-traumatic anger issues. For these reasons, we think these people did all that could possibly be asked of them. They exceed the Boyle standard. There requires no second opinion. They went out and went to the people they trusted most. Thank you very much for your time. All right. Thank you, counsel. And the court will be in recess until 9 o'clock tomorrow morning. All rise.